## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| ---------------------------------------------------------------------- x | | |
| TRADEX GLOBAL MASTER FUND SPC LTD., and | x | |
| TRADEX GLOBAL MASTER FUND SPC LTD., THE | x | |
| ABL SEGREGATED PORTFOLIO on behalf of | x | |
| themselves and all others similarly situated, | x | |
| | x | |
| Plaintiffs, | x | Civ. Action No.: |
| | x | |
| -against- | x | CLASS ACTION COMPLAINT |
| | x | |
| BLUE POINT MANAGEMENT, LTD., JAMES N. | x | JURY DEMAND |
| FRY, METRO II LLC, ARROWHEAD CAPITAL | x | |
| MANAGEMENT LLC and | x | |
| PRICEWATERHOUSECOOPERS | x | |
| | x | |
| Defendants | x | |
| ---------------------------------------------------------------------- x | | |

## CLASS ACTION COMPLAINT

1.      Plaintiffs, Tradex Global Master Fund, Ltd. and Tradex Global Master Fund SPC

Ltd., the ABL Segregated Portfolio ("Plaintiffs"), on behalf of themselves and as representatives

of a class consisting of all persons and entities that invested in, purchased or retained Shares in

ArrowHead Capital Finance, Ltd. ("ArrowHead" or the "Fund"), from the inception of the Fund

to the present, and who were damaged thereby (the "Class"), allege the following upon

information and belief, except for allegations pertaining to Plaintiffs, which are based on

personal knowledge.  Plaintiffs' information and belief is based upon a continuing investigation

conducted by Plaintiffs' counsel into the facts and circumstances alleged herein including,

without limitation, review and analysis of: (i) documents authorized and drafted by Defendants;

(ii) public statements, internet postings and other publications concerning ArrowHead and the

Defendants; and (iii) press releases, civil complaints, criminal indictments and other publications

relating to Thomas Petters, Petters Company, Inc., Petters Group Worldwide, LLC and their subsidiaries and affiliates (collectively, "Petters").

## SUMMARY OF ACTION

2.     Plaintiffs are shareholders in ArrowHead, which was managed by Defendants Blue Point Management, Ltd. ("Blue Point") and James N. Fry ("Fry"). As described below, ArrowHead was created to provide investors with "advantageous rates of return through investments in short-term secured debt securities of credit-worthy issuers." The Fund primarily purchased short-term secured notes from an entity controlled by Defendant Fry, Metro II, LLC ("Metro II"), which provided funding to inventory brokers by way of short-term secured notes (the "Metro II Notes"). In theory, the Fund was to make investments with Petters-affiliated entities, ostensibly to purchase electronic merchandise from U.S. suppliers affiliated with Petters; Petters would warehouse the merchandise and ship it to a retailer such as Sam's Club or Costco; and the retailer would pay a specialty financing source such as Metro II for the merchandise, which would repay the notes to ArrowHead with earned interest. As described below, none of this actually happened.

3.     During September 2008, a federal investigatory task force assembled in the District of Minnesota uncovered a massive fraudulent Ponzi scheme perpetrated by Petters. Petters and their co-conspirators have been charged with multiple federal felonies and more charges are expected. At present, the total estimate involved in the swindle approaches a staggering $3 billion.

4.     The essence of the scam was the completely fictitious sale of high-definition flat screen television sets and other expensive electronic consumer products by the Petters organization to retail wholesale clubs, including Sam's Club, Costco, and BJ's Wholesale Club.

Phony purchase orders and invoices were prepared and provided to persons who loaned money to the Petters Group, including numerous investment funds, which had in turn obtained money from private investors as their fiduciaries.

5.      In the federal investigation, FBI agents took the phony purchase orders and invoices directly to Sam's Club and Costco Wholesale to obtain confirmation of their legitimacy, and were immediately informed that they were bogus. Indeed, according to an affidavit executed by an FBI Special Agent, Petters and his co-conspirators knew this could happen and discussed it among themselves: "[I]f investors send auditors out to visit warehouses where the merchandise is located, . . . the scheme would implode."

6.      None of this was known to Plaintiffs and other investors when they purchased shares in ArrowHead. Indeed, the ArrowHead Offering Memorandum assured investors that the securities ArrowHead purchased would be evaluated on their "merits" and that "criteria" for qualifying inventory would be applied according to the circumstances of each transaction and according to certain "guidelines." Among other things, those "guidelines" required that inventory would be pre-sold prior to funds being applied to the purchase of underlying inventory from suppliers; end-purchasers would be rated 1-A or better by Dun & Bradstreet; and inventory would be covered by UCC financing statements naming ArrowHead as the secured party. Defendants also represented that the Fund would maintain trade credit insurance with respect to a portion of receivables underlying the notes. In fact, none of these "guidelines" were actually followed, nor did Defendants perform any meaningful due diligence regarding the Petters transactions, notwithstanding their fiduciary duties to Plaintiffs and other members of the Class.

7.      Thus, Defendants literally handed over hundreds of millions of dollars to Petters with no investigation or supervision whatsoever. Contrary to their assurances in Fund offering

documents, the Fund was not "secured" by any inventory; there was no trade credit insurance

covering the receivables underlying the notes; and there was no pre-purchasing of inventory.

Moreover, for their "efforts" on behalf of the Fund, Defendants paid themselves millions of

dollars in "management" and "incentive" fees over a several year period. In stark contrast, the

Fund is now in liquidation and Plaintiffs' investments are entirely worthless.

   8. As further described below, the annual financial statements for ArrowHead were

materially false and misleading inasmuch as they grossly overstated and mischaracterized the

financial results and condition of the Fund. Among other things, ArrowHead's financial

statements, as prepared, approved, and disseminated by Defendants, materially misstated: (i) the

fair value of the Fund's investments in the Petters-related notes; (ii) the income earned on the

Fund's investments in the Petters-related notes; and (iii) the net asset values of the Fund's shares.

   9. Defendant PricewaterhouseCoopers ("PWC") served as the Fund's outside auditor

at all relevant times. When a certified public accounting firm audits a client's financial

statements, it has a duty to exercise due professional care, professional skepticism and

objectivity, and to develop and follow procedures, analyses, and tests to verify the legitimacy and

accuracy of the client's assets, liabilities, operations, and cash flow. PWC failed in these duties

when it conducted audits that were so superficial and perfunctory that it failed to detect that the

assets reflected in the Fund's financial statements were a complete and total sham. For several

years, moreover, PWC disseminated audit opinions to the Fund's shareholders falsely

representing that the Fund's financial statements "present fairly, in all materials respects," the

financial position of the Fund and the  results of its operations in conformity with accounting

principles generally accepted in the United States.

10.     Defendant Blue Point served as the Manager of ArrowHead at all relevant times, while Defendant Fry served as a Blue Point Director, "principal" and President. In addition to misrepresenting the Fund's business and operations, as particularized below, Blue Point and Fry ignored their fiduciary obligations to Plaintiffs and the Class by failing to take any reasonable measures to evaluate whether the Fund's Petters-related investments were legitimate and made on economic terms that were fair to the Fund's shareholders.

## JURISDICTION AND VENUE

11.     Subject matter jurisdiction exists in diversity pursuant to 28 U.S.C. Section 1332(a)(3), inasmuch as the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States and in which citizens of a foreign state are additional parties.

12.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b) because a substantial part of Defendants' conduct giving rise to the claims asserted herein occurred in this District. Among other things: Defendant Fry, as principal of the Manager of the Fund, assisted in selection of the Fund investments, managed the Fund investments, held meetings regarding the operations of the Fund and communicated with potential and existing ArrowHead shareholders from his Minnetonka, Minnesota office. In addition, Defendant PWC interacted with Blue Point and Fry in their Minnetonka, Minnesota offices. Several of the Petters-related entities were also located in Minnesota.

## PARTIES

13.     Plaintiff Tradex Global Master Fund, Ltd. and Plaintiff Tradex Global Master Fund SPC Ltd., the ABL Segregated Portfolio, are each a British Virgin Islands Business Company Limited by Shares and registered as a Segregated Portfolio Company under the laws of

the British Virgin Islands.  Plaintiffs' investment advisor is Tradex Global Advisors LLC, which maintains its principal place of business in Connecticut.  On or about November 1, 2007, June 1, 2008, August 1, 2008, and September 1, 2008, Fortis Bank, as custodian, purchased shares in ArrowHead for Plaintiffs, as beneficial owners.

14.     Defendant Blue Point Management, Ltd. is a company incorporated under the laws of Bermuda.  Blue Point is responsible for the discretionary investment of the Fund's assets.

15.     Defendant James N. Fry served as a Director, President and "principal" of Blue Point at all relevant times.  According to the Offering Memorandum, Fry was responsible for supervising the role and functions of Blue Point to be performed pursuant to the Investment Management Agreement.  In addition, Fry was primarily responsible for all investment decisions made by Blue Point with respect to the investment of the Fund's assets.  Defendant Fry was also a director and President of ArrowHead Capital Management, LLC.   Fry is a citizen of the state of Minnesota.

16.     Defendant Metro II LLC ("Metro II") is a Delaware limited liability company with a principal place of business at 601 Carlson Parkway, Suite 1250, Minnetonka, Minnesota.  Fry is the founder and a principal of Metro II.  Metro II is owned by ArrowHead Capital Management LLC.

17.     Defendant ArrowHead Capital Management LLC ("ArrowHead Capital Management") is a Minnesota limited liability company with a principal place of business at 601 Carlson Parkway, Suite 1250, Minnetonka, Minnesota.  Fry is the founder and a principal of ArrowHead Capital Management.

18.     Defendant PWC served as the Fund's outside auditor at all relevant times.  PWC's
internet website devotes an entire section to "Fighting Fraud" as one of its "Client Challenges."
According to the website:

> What can be done to detect and prevent fraud within your company before it's too
> late? Regulator scrutiny continues to increase. The number of SEC investigations,
> Department of Justice investigations and securities litigation cases remain well
> above historical averages. Antifraud programs and controls are now required
> under Sarbanes-Oxley. These compliance programs will be evaluated annually.
> This collection of white papers and articles will help arm you to detect and
> prevent fraud.

## SUBSTANTIVE ALLEGATIONS

### The ArrowHead Offering Memorandum

19.     Dated March 17, 2003 and May 1, 2007, Defendants made available to investors
certain offering memoranda relating to the sale of shares in ArrowHead (collectively, the
"Offering Memorandum").  The Offering Memorandum was prepared, reviewed and/or approved
by Defendants Blue Point and Fry.  Pursuant to the Offering Memorandum, the Fund offered
investors shares with a par value of $0.01 each (the "Shares").

20.     As set forth in the Offering Memorandum, the investment objective of the Fund
was to achieve:

> advantageous rates of return through investments in short-term
> secured debt securities that are (i) secured by payment obligations
> of collateral purchasers rated 1-A or better by Dun & Bradstreet or
> (ii) collateralized by secured debt securities of collateral purchasers
> having such ratings (the "Secured Instruments").

21.     The Offering Memorandum represented that "[t]he Fund intends to invest the
proceeds of the Shares primarily in Secured Instruments that have yields significantly higher than
United States Treasury securities and commercial paper."

22.    The Offering Memorandum also described the core inventory financing in which

it had engaged and anticipated continuing:

> Other funds with similar investment objectives managed by the
> manager have invested in secured notes issued by companies that
> finance inventory brokers.  Inventory brokers frequently seek to
> access the debt markets in order to finance the acquisition of
> quality inventory items for which purchase commitments already
> have been issued to the inventory broker.  Because traditional
> financing institutions are often unable to react in a timely fashion
> to provide the necessary level of interim financing to facilitate
> wholesale inventory transactions, such transactions are frequently
> financed by specialty financing sources that have issued short-term
> notes that satisfy the Fund's investment parameters with respect to
> the Shares.  Although the Fund will not participate directly in any
> financing activity or inventory transactions with respect to the
> Shares, the Fund has invested and may invest in the future in debt
> securities offered by such specialty financing sources, investments
> placed by Captioline Global Finance Inc. ("CGF") and investments
> originated by Metro LLC ("Metro II"), an entity affiliated with Mr.
> James Fry, the principal of the Manager.

23.    In further describing its investments, the Offering Memorandum assured the

investors that the utmost due diligence would be utilized in purchasing notes secured by

inventory:

> The Fund anticipates that it may purchase securities privately
> placed by CGF (the "Transactions") only where the qualifying
> inventory securing the offered note of the applicable Principal
> Issuer consists of merchandise that is (a) a well-known brand
> name, (b) top quality and (c) either household goods, apparel,
> sporting goods or electronic goods.  Perishable goods, alcohol,
> firearms and tobacco will not constitute qualifying inventory.
>
> Each Transaction is evaluated on its own merits, and criteria for
> qualifying inventory are applied according to the circumstances of
> each transaction and according to guidelines followed since
> inception and as updated from time to time.  Such guidelines
> provide for inventory being pre-sold prior to funds being applied to
> the purchase of underlying inventory from suppliers, end-
> purchasers being rated 1-A or better by Dun & Bradstreet, and

inventory in the United States being covered by Uniform Commercial Code financing statements naming the Fund as the secured party.

24.     The Offering Memorandum also noted that Defendants intended to maintain trade credit insurance which would cover from 25 to 100 percent of the principal amount of the notes held by the Fund based on the credit ratings of the obligors with respect to the receivables of the applicable underlying principal issuer.

25.     Shares in the Fund were subject to a management fee equal to 0.125 percent per month (1.5% per annum) of the net asset value of the Fund attributable to the Shares, before deduction for any accrued incentive fees.  Blue Point was also entitled to a quarterly "incentive fee," which was generally up to 20 percent of the "Net Capital Appreciation" of the Shares achieved during the relevant quarter.  For the years 2003-2006, Blue Point and Fry earned approximately $13 million in management fees and over $11 million in incentive fees.

**Other Blue Point Documents**

26.     In addition to creating the Offering Memorandum, defendants Blue Point and Fry issued a report entitled "Due Diligence Information for ArrowHead Capital Finance, Ltd." (the "Due Diligence Report").  Blue Point's Due Diligence Report provided general information about the Fund, its historical returns and details about the structure of the transactions.  While mostly a reiteration of the Offering Memorandum (via summaries and reference to the Offering Memorandum itself), the Due Diligence Report also noted that:

> The Fund intends to achieve its objectives through strategic purchases of Notes issued by one or more inventory brokers or their affiliates.  The Fund intends to purchase Notes secured by inventory financing arrangements of pre-sold, top quality, name-brand merchandise, taking advantage of:

- The increasing number of liquidations, resulting in what the manager believes to be a global build-up of quality consumer items;

- The established track record, distribution and sales network of the Issuing Inventory Broker and their ability to source and service wholesale inventory placements; and

- The inability of traditional financing sources to react quickly enough to provide the necessary level of interim financing to facilitate wholesale inventory transactions.

27.     Answering the question, "Is deal flow sustainable," the Due Diligence Report also stated:

> Deals have been steady since inception of Fund.  Fund has engaged in over 1,000 deals involving over $4 Billion of inventory. Although not guaranteed, the manager sees no immediate reason for deal flow to diminish.

28.     Under the question, "What is the underwriting/risk assessment process?", the Due Diligence Report referred to the Offering Memorandum's "Certain Transactions" section. Thus, the Due Diligence Report reiterated that the underwriting/risk assessment process for Fund investments would be for each transaction to be purportedly evaluated on its own "merits", pursuant to specific "criteria" for qualifying inventory and according to "guidelines."

29.     Defendants also prepared and circulated monthly status reports to ArrowHead shareholders, which contained:

- Monthly and year-to-date returns on a percentage basis;

- The total amount of Fund assets; and

- The breakdown of underlying collateral by type.

For example, the August 2008 ArrowHead monthly report recited that: "Consumer Electronics" comprised 99% of the Fund's underlying collateral; the Fund's returns were up 6.31% for the

year to date; the Fund's returns were up 192.5% since the Fund's inception in November 1999;

the average monthly return was 1.02%; the average annual return for 2002 through 2006 was

11.13%; and, since the Fund's inception, there was a positive return for 105 of 106 months.

**The Petters Fraud**

30.      During September 2008, a federal investigatory task force assembled in the

District of Minnesota uncovered a massive fraudulent Ponzi scheme perpetrated by Petters

beginning as early as 1993. Petters and his co-conspirators have been charged with multiple

federal felonies and more charges are expected. Four of those co-conspirators have pleaded

guilty to fraud, money laundering and other charges. At present, the total estimate involved in

the swindle approaches $3 billion.

31.      The essence of the scam was the completely fictitious sale of high-definition flat

screen television sets and other expensive electronic consumer products by the Petters

organization to retail wholesale clubs, including Sam's Club, Costco Wholesale, and BJ's

Wholesale Club. Phony purchase orders and invoices were prepared and provided to persons

who loaned money to Petters, including numerous investment funds, which had, in turn, obtained

money from private investors as their fiduciaries. As described in the October 2, 2008, Affidavit

of an FBI Special Agent (the "FBI Affidavit"):

> The primary method of effectuating the fraud scheme involves
> PETTERS, his employees, and his associates creating fictitious
> documents and then providing these documents to current and
> potential investors as evidence that PCI is buying and selling
> substantial goods and merchandise which PCI will then resell. In
> many instances, funds from investors are sent directly to the
> purported supplier of the merchandise, AIR or ENCHANTED. In
> turn, AIR or ENCHANTED direct the funds to PCI (less a
> commission) without any merchandise. PETTERS and other
> persons then fraudulently pledge the non-existent goods and
> merchandise as security for the investments.

32.     In the federal investigation, FBI agents took the phony purchase orders and
invoices directly to Sam's Club and Costco Wholesale to obtain confirmation of their legitimacy,
and were immediately informed that they were completely bogus.  Indeed, according to the FBI
Affidavit, Petters and their co-conspirators knew this could happen and discussed it among
themselves: "[If investors send auditors out to visit warehouses where the merchandise is
located, . . . the scheme would implode."

**The Transactions With Petters Were Entirely Fictitious**

33.     Since its inception, ArrowHead received millions of dollars in subscriptions from
investors such as Plaintiffs.  Most of this money was loaned to specialty financing sources, such
as Metro II and ArrowHead Capital Management, which, in turn, gave the money to Petters and
his affiliates.

34.     In fact, the transactions with Petters were completely bogus.  There was no
merchandise purchased or sold with the monies paid by the specialty financing sources; thus,
there was no collateral securing the loans to ArrowHead as Defendants represented.  Moreover,
the purchase orders and invoices purportedly underlying the transactions were entirely fictitious;
consequently, the UCC filings and loan documents associated with the transactions were based
on fraudulently prepared documents.  This left the Fund and its investors with no security or
other protections for their investments.

**The ArrowHead Documents Were Materially False and Misleading**

35.     Given the fraudulent nature of the Fund's transactions, the non-existence of
merchandise securing the Fund's loans, and the documents associated with the loans, the
representations contained in the Offering Memorandum, the Due Diligence Report, the Audit

Reports and the monthly reports (collectively referred to as the "ArrowHead Documents") were materially false and misleading and concealed material facts from members of the Class. Among other things:

      (A)    The representations regarding the purchases of "merchandise" and "inventory" underlying the Fund's transactions were materially false and misleading. In fact, there was no "merchandise" or "inventory" ever purchased in connection with the Fund's Petters-related transactions.

      (B)    The representations regarding trade credit insurance policies were materially false and misleading. Because there was no merchandise or inventory purchased by retailers, whatever insurance was secured was invalid and of no force and effect.

      (C)    The representations regarding Uniform Commercial Code financing statements and the purported "security" interest this afforded the Fund were materially false and misleading. Given the sham nature of the Petters-related transactions, whatever UCC-1 statements and liens were filed for, or on behalf of, the Fund provided no benefits or "security" to the Fund whatsoever.

      (D)    The representation that the Fund "… would seek to structure all of its investments in a manner which mitigates any default risk to the Shares …" was materially false and misleading. Given the fact that no merchandise or inventory was ever purchased in connection with the Fund's Petters-related transactions, there was no viable manner in which to structure the Fund's investments which would mitigate default risk.

(E)   The representations that the Fund followed specific criteria to inventory securing the notes pursuant to "guidelines" and that such guidelines required, among other things, that end-purchasers were rated 1-A by Dun & Bradstreet and inventory in the U.S. being covered by UCC financing statements, were materially false and misleading.  Because the Petters-related transactions were entirely fictitious, there were no meaningful "guidelines" in place; there were no "end-purchasers" with Dun & Bradstreet ratings; and there was no "inventory" covered by UCC statements.

(F)   The representations concerning the type, number and purported value of the inventory deals done by the Fund were materially false and misleading because no inventory was ever purchased in connection with the Fund's Petters-related transactions;

(G)   The representations concerning a "global build up of quality consumer items" and the "established track record of the Issuing Inventory Broker" were materially false and misleading as the Petters-related inventory purchases and sales were a complete sham; and

(H)   The representations regarding the monthly, year-to-date, and lifetime returns of the Funds were materially false and misleading as the fictitious Petters transactions made these numbers completely bogus.

**The Role of Defendants Blue Point and Fry**

36.   As the Manager of the Fund, Blue Point had the full and sole discretion to manage the investment portfolio of the Fund.  As a Director and President of Blue Point, Defendant Fry

was responsible for supervising the role and function of Blue Point to be performed pursuant to the Investment Management Agreement. In addition, Fry was primarily responsible for all investment decisions made by the Manager with regard to the investment of the Fund's assets.

37.     Defendants Blue Point and Fry were required to undertake adequate due diligence with regard to the investment and monitoring of the Fund's assets. They did not undertake this due diligence with regard to the Petters-related investments, despite their fiduciary duties to do so. Their abject failure to conduct necessary procedures to verify the legitimacy of the notes and the transactions underlying them is all the more egregious given that: (i) the Fund's investments were predominantly in notes issued by Metro II, an entity organized and owned by ArrowHead Capital Management; and (ii) according to the notes to the 2006 ArrowHead Financial Statements, Senior Metro II notes were declared in default by the Fund in 2006, causing the Fund to take security interests in additional assets made available by affiliates of Metro II and Defendant Fry.

**The Role of PWC**

38.     PWC purportedly conducted audits of the Fund's financial statements. In the context of these audits, the Fund's shareholders were furnished with clean audit opinion letters from PWC dated February 13, 2004, February 11, 2005, April 4, 2006, and October 18, 2007 (collectively, the "Audit Reports"). The Audit Reports issued by PWC represented that the Fund's financial statements presented fairly, in all material respects, its financial position and the results of its operations, changes in net assets, and the Fund's cash flow for each year, in conformity with accounting principles generally accepted in the United States ("GAAP").

39.     PWC's Audit Reports were specifically addressed and directed to the "Board of Directors and Shareholders of ArrowHead Capital Finance Ltd." PWC thus expected and

intended shareholders of the Fund to rely on the thoroughness, accuracy, integrity, independence, and overall professional caliber of its audits.

40.     In performing audits of financial statements, certified public accountants are required to follow generally accepted auditing standards ("GAAS") in arriving at their opinion that the financial statements are fairly stated in accordance with GAAP.  When performing an independent audit of a client's financial statements, a professional certified public accountant is obligated to follow these standards, among others:

> (A)   In all matters relating to the performance of the audit, the auditor is obligated to exercise and maintain professional skepticism and an independence in mental attitude;
>
> (B)   Due professional care must be exercised in the performance of the audit and the preparation of the audit report;
>
> (C)   A sufficient understanding of internal controls must be obtained to plan the audit and to determine the nature, timing, and extent of tests to be performed;
>
> (D)   Sufficient competent evidential matter must be obtained by inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.  This includes seeking and obtaining reliable information from independent sources, including third parties; and
>
> (E)   The auditor has the responsibility to plan, supervise, and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud.

41.     In performing its audits of the Fund's financial statements, PWC breached its duties to Plaintiffs and other members of the Class by violating one or more applicable auditing standards, including those identified above.  For example, PWC issued unqualified audit opinions, purportedly after conducting an audit in accordance with GAAS, when bogus purchase orders and invoices were taken by federal investigators to Sam's Club and BJ's Wholesale Club, and immediately denounced by those retailers as fraudulent.  Any reasonable and minimal investigation of third party participants, as required by GAAS, would have uncovered this thinly veiled fraud during any of the multiple audits supposedly performed by PWC.

42.     PWC ignored multiple red flags that would have led any reasonable auditor exercising professional skepticism to inquire further to obtain the requisite level of comfort.  The red flags to which PWC paid no attention included: (i) beginning in 2007, the Petters notes began to become overdue, signaling a level of financial stress and instability that should have triggered further investigation; and (ii) while the money to satisfy the loan obligations underlying the notes was, according to the transactional structure of these purchase-order financing arrangements, supposed to come from the retailer purchasers of the merchandise, the money was instead coming from Petters himself, indicating the existence of a Ponzi scheme.

43.     In addition, PWC's Audit Reports for ArrowHead were materially false and misleading inasmuch as they grossly overstated and otherwise mischaracterized the financial results and the condition of the Fund.  Among other things, the Fund's financial statements, as prepared, reviewed, approved, and disseminated by PWC, materially misstated: (i) the fair value of the Fund's assets; (ii) shareholders' capital; and (iii) the Fund's income.

**The Role of Metro II and ArrowHead Capital Management**

44. The Fund's monies were, in whole or in part, transmitted to Metro II and ArrowHead Capital Management in return for notes issued to the Fund. In fact, those notes were completely worthless. As a result, Metro II and ArrowHead Capital Management appropriated millions of dollars of Class members' monies in return for consideration that had no value whatsoever. The actions of Metro II and ArrowHead Capital Management -- both of which were controlled by Defendant Fry -- were grossly improper and fraudulent.

**Defendants' Knowing or Reckless Conduct**

45. Defendants' false and misleading statements, failures to act, and breaches of fiduciary duties, as described above, were made knowingly and/or recklessly. Viewed alone or collectively, Defendants' culpable state of mind is demonstrated by the following facts and circumstances:

(A) Defendants' repeated failures to investigate and verify the validity of the Fund's transactions demonstrates knowing or reckless conduct. Upon information and belief, Defendants did not verify the accuracy of the purchase orders, invoices, bills of sales and other documents associated with the Fund's transactions with Petters; did not visit any warehouses to verify that there was actually merchandise securing the transactions with Petters; did not contact retailers to verify the purchase of goods from merchandise suppliers; and did not verify the existence of credit insurance for the merchandise that purportedly secured the Fund's loans. At a minimum, these egregious and repeated failures to act demonstrates that Defendants acted with gross recklessness in connection with the challenged misstatements and misconduct described above.

(B)     Defendants' ignorance of clear and obvious warning signs of fraud demonstrates knowing or reckless conduct.  Given their access to the Fund's accounts, bank statements and Petters himself, Defendants knew the principal and interest payments received by the Fund came not from the ultimate buyer of merchandise as represented in the Fund's offering documents, but from Petters and his sham companies.  The fact that ArrowHead did not receive payments from any retail buyers was a clear and obvious warning sign that there was no merchandise being sold by Petters, but that Petters, employing a Ponzi scheme, was using monies from one investor to pay off loans owed to others.

(C)     The magnitude of the fraud demonstrates knowing or reckless conduct. The investments with Petters did not encompass a small or even modest portion of the Fund's assets.  To the contrary, Defendants diverted millions of dollars to the Petters Ponzi scheme. Thus, almost 100% of investor money was lost as a direct result of the fraudulent conduct described herein.

(D)     Defendants' financial motives also demonstrate knowing or reckless conduct.  As described above, Defendants had enormous financial incentives to misrepresent the Fund's strategies and their work on the Fund's behalf.  Among other things, Blue Point was slated to earn a management fee of 1.5% per annum of the Fund's assets (irrespective of how the Fund actually performed), as well as up to 20% of the appreciation in the Fund's assets as an incentive fee.  As Blue Point's Director and President, Defendant Fry obviously had the same financial motivation as Blue Point.  Similarly, Defendant PWC received significant fees and other payments for the "work" they performed on behalf of the Fund's shareholders.  Thus, Defendants had strong financial motives to misportray the Fund's strategies and transactions

given the millions of dollars in fees and incentive compensation they could -- and did -- generate during the Fund's duration.

**Loss Causation**

46.     The misrepresentations and misconduct described above directly and proximately caused the millions of dollars in losses sustained by Plaintiffs and the Class as alleged herein. Among other things, the absence of collateral and credit insurance relating to the Petters transactions left investors with no security when the Petters notes were exposed as worthless. Thus, the protections and safeguards Defendants promised shareholders regarding the Fund's transactions simply did not exist, leaving Class members with millions of dollars in losses.

47.     Similarly, Defendants' abject failure to perform due diligence and monitor the Petters transactions directly caused or contributed to shareholder losses. Had such due diligence and monitoring actually been performed, shareholders would not have lost money in the Petters Ponzi scheme. Instead, shareholder monies were effectively handed over to Petters without the slightest assurance they would be returned, let alone that Plaintiffs and other Class members would realize a meaningful return on their investments.

48.     Defendants' repeated and inexcusable failures to monitor the Fund's transactions and employ protections and safeguards regarding those transactions were concealed from Plaintiffs and other members of the Class at all relevant times.   When these risks and conditions materialized, Plaintiffs sustained direct and immediate losses in their investments.

49.     Defendants could also readily anticipate that the absence of *bona fide* transactions with Petters, collateral securing the Fund's transactions, and due diligence concerning the Fund's investments, would lead directly to the losses sustained by the Class. Thus, the fact that Plaintiffs and other Class members could – and ultimately did – sustain massive losses on the

monies invested in ArrowHead as a direct result of the misconduct described herein was eminently foreseeable to Defendants.

**Defendants' Negligence, Mismanagement and Breaches of Fiduciary Duties**

50.     Defendants owed Plaintiffs and other shareholders of the Fund fiduciary duties of due care, good faith, loyalty and complete candor. As the Manager of the Fund's investments, Defendant Blue Point had the full and sole discretion to manage the investment portfolio of the Fund, and as the principal of Blue Point, Defendant Fry had unique and special relationships *vis a vis* Plaintiffs and other members of the Class. Among other things, these Defendants (including Metro II and ArrowHead Capital Management, which were controlled by Defendant Fry): (i) reviewed, approved and disseminated offering and promotional materials to Plaintiffs regarding the Fund; (ii) had unique and superior access to financial and operational information regarding the Fund's investments (access Class members did not have); (iii) were ostensibly in communication with Petters and the counterparties that engaged in purported transactions with Petters (communications Class members were not privy to); (iv) were paid management, performance and directors' fees for their purported work on behalf of the Fund, some of which were derived from monies Class members paid for their Shares; and (v) had exclusive decision-making authority regarding the Fund's investments.

51.     Likewise, Defendant PWC owed fiduciary obligations of due care, good faith and complete candor to Plaintiffs and the Class. Specifically, PWC executed agreements with the Fund pursuant to which it agreed to perform accounting services on behalf of the Fund and its shareholders. These services should have included testing transactions, reviewing underlying loan documents, and accurately computing net asset values for the Fund. Defendant PWC was

paid fees for these services, and, as such, was obligated to perform them with appropriate skill, competence and due care.

52.     In addition, as described above, PWC had direct communications with shareholders of the Fund, and, thus, knew shareholders were relying on their work and expertise regarding the Fund's financial results, investments and operations.  For example, PWC provided shareholders of the Fund with clean Audit Reports and had telephonic communications with members of the Class regarding the Fund.  Based on these and other contacts, there were unquestionably special and unique duties of care, loyalty and good faith owed by PWC to Plaintiffs and members of the Class, and, thus, it was clearly foreseeable to PWC that Class members would be, and in fact were, relying upon these representations in connection with the purchase and retention of Shares in the Fund.

53.     On repeated and multiple occasions, Defendants breached their duties of care, loyalty, good faith and candor to Plaintiffs and members of the Class.  Among other things, these Defendants: (i) made and authorized loans that were not secured by collateral or credit insurance; (ii) failed to verify the authenticity of documents purportedly supporting transactions with Petters; (iii) failed to contact the putative buyers of merchandise to determine whether transactions with Petters were legitimate; (iv) failed to visit warehouses to confirm there was merchandise securing the loans; (v) exaggerated and failed to properly calculate the net asset value of Shares in the Fund; (vi) reviewed and approved UCC filings and loan documents that were premised on fabricated invoices, purchase order and invoices; and (vii) circulated reports to investors that misrepresented the Fund's investments, value and performance.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

54.     Pursuant to Federal Rule 23(a) and (b)(3), Plaintiffs brings this action on behalf of themselves and as representatives of all persons and entities that invested in, purchased or retained Shares in ArrowHead, from the inception of the Fund to the present, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, their accountants, auditors, and administrators, persons and/or entities that earned fees, commissions, or other compensation or monies selling shares in the Fund, the parents, subsidiaries, and affiliates, and/or immediate family members of any of the foregoing.

55.     Although Plaintiffs do not presently know the exact size of the Class since such information is in the exclusive control of Defendants, based on the nature of the activities involved herein, Plaintiffs believe that there are more than twenty five members of the Class who are geographically dispersed, and thus that joinder of all members is impracticable.

56.     Plaintiffs can and will fairly and adequately represent the interests of the Class and have no interests that conflict with or are antagonistic to the interests of Class members. No conflict exists between Plaintiffs and other Class members.

57.     Plaintiffs are represented by counsel experienced in class actions and complex civil litigation so as to ensure the adequate representation of absent Class members.

58.     Plaintiffs' claims are typical of those of all members of the Class, as all members of the Class were damaged by Defendants' conduct, as complained of herein.

59.     Questions of law and fact arising out of Defendants' conduct are common to all members of the Class, and to the extent applicable, such common issues of law and fact predominate over any questions affecting only individual members of the Class. The common issues of law and fact include, but are not limited to, the following:

(A)    whether Defendants breached their fiduciary duties to Plaintiffs and the

Class;

(B)    whether Defendants acted negligently in overseeing and

managing the Fund's investments;

(C)    whether Defendants were unjustly enriched by virtue of the

misconduct alleged herein;

(D)    whether Defendants made false and misleading statements

and omissions of material facts in connection with the Fund;

(E)    whether PWC negligently audited the financial statements

of the Fund; and

(F)    the extent to which the members of the Class have been

damaged, and the proper measure of damages.

60.    A class action is the superior procedural vehicle for the fair and efficient

adjudication of the claims asserted herein given that:

(A)    Common questions of law and fact overwhelmingly

predominate over any individual questions that may arise, such that significant economies of

time, effort, and expense will inure to the courts and the parties in litigating the common issues

on a class wide instead of a repetitive individual basis;

(B)    the size of some Class members' individual damage claims is too small to

make individual litigation an economically viable alternative, such that not all Class members

have any interest in or the means of individually controlling the prosecution of a separate action;

(C)    class treatment is required for optimal deterrence;

(D)     litigating these matters as a class action will avoid the unnecessary time

and expense, and the risk of inconsistent rulings and verdicts, inherent in repetitive individual

litigation; and

(E)     the claims or defenses of the Plaintiffs are typical of the claims or defenses

of the Class.

## CLAIMS

### COUNT I:

**For Breach of Fiduciary Duty**
**(Against All Defendants Other than Metro II and Arrowhead Capital Management)**

61.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.

62.     The Defendants named in this Count owed and breached their fiduciary duties to

Plaintiffs and other Class members.

63.     As detailed elsewhere herein, a unique degree of trust and confidence existed

between Plaintiffs and the members of the Class, on the one hand, and the Defendants named in

this Count, on the other.

64.     Because of, among other things, their access to internal financial information

from, and about, the Fund and its investments, Defendants possessed superior knowledge, skill,

and expertise *vis a vis* investors in the Fund such as Plaintiffs.  In addition, given what

Defendants knew or should have known about the Fund and its investments and transactions,

Defendants could reasonably anticipate the harm and damage Plaintiffs and other Class members

suffered as described above.  The Defendants named in this Count thus had a duty to represent

and safeguard the interests of Plaintiffs and other Class members.

65.    As a result of their conduct as alleged herein, the Defendants have failed to fulfill their fiduciary duties of, among other things, due care, complete candor, fair dealing, and good faith.

66.    As a proximate result of Defendants' breaches of their fiduciary duties, Plaintiffs and other Class members have sustained damages, having lost all or substantially all of their investments in the Fund in an amount yet to be determined and to be proven at trial.

67.    The actions of the Defendants were willful and wanton, and Plaintiffs and the Class are entitled to punitive damages.

## COUNT II:

### For Negligence
### (Against All Defendants)

68.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

69.    Defendants owed Plaintiffs and the other investors in the Fund a duty of care, fair dealing, complete candor and good faith (among others) in connection with, *inter alia*, their obligations to investigate, oversee, and monitor and manage the Fund's investments and transactions.  In addition, given what they knew or should have known about the Fund and its investments and transactions, Defendants could reasonably anticipate the harm and damage Plaintiffs and the other Class members suffered as described above.

70.    Any reasonable and minimal due diligence by Defendants into the Fund's dealings with Petters would have uncovered the misconduct depicted herein.

71.    Defendants acted negligently and violated their foregoing duties by failing to conduct reasonable and minimal due diligence into the Fund's investments.

72.     As a direct and proximate result of Defendants' negligence, Plaintiffs and the

Class have suffered damages in an amount yet to be determined, and to be proven at trial.

## COUNT III:

### For Unjust Enrichment
### (Against All Defendants)

73.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.

74.     Defendants were compensated, and otherwise benefitted financially in connection

with their unlawful acts as alleged herein.  These unlawful acts caused Plaintiffs and the other

members of the Class to suffer injury and monetary loss as set forth above.

75.     As a result of the foregoing, it was unjust and inequitable for Defendants to have

enriched themselves in this manner.

76.     Each Defendant should pay its own unjust enrichment to Plaintiffs and the other

members of the Class.

77.     Plaintiffs and the other members of the Class are entitled to the establishment of a

constructive trust imposed on the benefits accruing to Defendants from their unjust enrichment

and inequitable conduct as described herein.

## COUNT IV:

### For an Accounting
### (Against Defendants Blue Point, Fry Metro II and ArrowHead Capital Management)

78.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing

paragraphs as if fully set forth herein.

79.     Defendants Blue Point, Fry, Metro II and ArrowHead Capital Management had a

duty to document and keep records of: (i) the investments and transactions made on behalf of

Plaintiffs and the other members of the Class; and (ii) the management, performance, and professional fees, commissions, and other compensation Defendants collected in connection with the Fund.

80.    As set forth above, these Defendants were unjustly enriched by their misconduct, thus entitling Plaintiffs to the imposition of a constructive trust that cannot be implemented without a thorough and comprehensive accounting.

81.    The amount of money due from the Defendants named in this Count to Plaintiffs and the Class is unknown to Plaintiffs and cannot be ascertained without an accounting of: (i) the actual investments and transactions made on Plaintiffs' and the Class's behalf; (ii) the actual calculations used to determine all management, performance, and other such fees and compensation; and (iii) the amounts taken by Defendants as management and performance fees, commissions, and other compensation in connection with the Fund.

## COUNT V:

### For Negligent Misrepresentations
### (Against all Defendants other than Metro II and ArrowHead Capital Management)

82.    Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

83.    As set forth above, the Fund's Offering Memorandum, the Due Diligence Report, the Audit Reports and the monthly summaries prepared and disseminated by Defendants contained false omissions and representations made as statements of fact for the guidance of Plaintiffs and other members of the Class.

84.     Plaintiffs and the other members of the Class, in justifiable reliance on these documents and communications, purchased, continued to purchase, and retained Shares in the Fund.

85.     Defendants, who owed Plaintiffs and members of the Class duties of care, honesty, candor and good faith, made the foregoing false omissions and representations in the course of their business, professions and employment, and, in so doing, failed to exercise reasonable care and competence in obtaining and communicating such information to Plaintiffs and other members of the Class.

86.     Plaintiffs and the other members of the Class, as a direct and proximate result of Defendants' false and negligent representations and omissions, have sustained damages, having lost all or substantially all of their respective investments in the Fund attributable to Petters or Petters-related entities in an amount yet to be determined and to be proven at trial.

## COUNT VI:

### For Conversion
### (Against Defendants Blue Point, Fry, Metro II and ArrowHead Capital Management)

87.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

88.     Plaintiffs and the other Class members invested their own money in the Fund. The monies they entrusted to the Fund thus belonged to Plaintiffs and the Class.

89.     The Defendants named in this Count deprived Plaintiffs and the other members of the Class of these monies for an indefinite period of time, by misappropriating the monies and misdirecting them through their improper acts, thus wrongfully converting Plaintiffs' and the

Class's investments for the benefit of themselves and Petters and to the detriment of Plaintiffs and the rest of the Class.

90.     Plaintiffs and the other members of the Class never authorized Defendants' conduct as set forth in this Count.

91.     Plaintiffs and the other members of the Class, as a result of Defendants' acts of conversion, have been damaged through the loss of all or substantially all of their respective investments in the Fund attributable to Petters or Petters-related entities, in an amount yet to be determined and to be proven at trial.

COUNT VII:

**For Aiding and Abetting Breaches of Fiduciary Duty**
**(Against Defendant PWC, Metro II and Arrowhead Capital Management)**

92.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

93.     Defendants Blue Point and Fry engaged in breaches of fiduciary duty as particularized above, which resulted in economic harm to Plaintiff and the other members of the Class.

94.     As the Fund's outside auditor, PWC had actual and intimate knowledge of the purported transactions and investments being made on behalf of the Fund and, with that knowledge, knew of the breaches of fiduciary duties committed by Blue Point and Fry, or were willfully blind to substantial evidence of such breaches.

95.     As set forth in greater detail elsewhere herein, Defendant PWC substantially and knowingly assisted in, or acquiesced to or approved, the breaches of fiduciary duty committed by Blue Point and Fry.

96.     Plaintiffs and the other members of the Class have suffered damages proximately

caused by the aiding and abetting of the foregoing breaches of fiduciary duties by Defendant

PWC in an amount yet to be determined and to be proven at trial.

**COUNT VIII:**

**For Common Law Fraud**
**(Against all Defendants other than PWC, Metro II and ArrowHead Capital Management)**

97.     Plaintiff restates and realleges each and every allegation contained in the

foregoing paragraphs as if fully set forth herein.

98.     As set forth above, the Fund's Offering Memorandum, the Audit Reports and the

account statements prepared and disseminated by Defendants contained false representations and

omissions of material fact.

99.     Plaintiff and the other members of the Class, in reliance on these materials,

purchased, continued to purchase, and retained Shares in the Fund.

100.    At the time the subject misrepresentations and omissions were made, Defendants

knew the misrepresentations to be false and misleading or were reckless in not knowing that they

were false and misleading, and intended to deceive Plaintiff and the other members of the Class.

101.    Had Plaintiff and the other members of the Class known of the material facts that

the Defendants misrepresented and omitted, Plaintiff and the Class would not have purchased,

continued to purchase, or retained their Shares in the Fund.

102.    Plaintiff and the other members of the Class, as a result of their purchases and

retention of Shares in the Fund, and by reason of Defendants' false and misleading

misrepresentations and omissions, have sustained damages, having lost all or substantially all of

their respective investments in the Fund attributable to Petters or Petters-related entities in an amount yet to be determined and to be proven at trial.

103.    By reason of the foregoing, the Defendants are jointly and severally liable to Plaintiff and all other Class members.

104.    Defendants' fraudulent acts were willful and wanton, and Plaintiff and the Class are entitled to punitive damages to be proven at trial.

### JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully prays that the Court grant the following relief:

A.    That the Court certify the Class defined herein and appoint undersigned counsel as lead counsel for the Class;

B.    That Plaintiffs and the members of the Class be awarded damages in an amount to be proven at trial;

C.    That Plaintiffs and the members of the Class be awarded their costs, disbursements, and attorneys' fees to the fullest extent permitted by law;

D.    That Plaintiffs and the members of the Class be awarded punitive damages, to the fullest extent permitted by law; and

E.    That the Court order such further or additional relief as it deems just, proper, and equitable.

Dated: July 7, 2009

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**

Richard A. Lockridge, #64117
Gregg M. Fishbein, #202009
Karen Hanson Riebel, #219770
100 Washington Avenue South
Suite 2200
Minneapolis, MN 55401-2197
Phone: (612) 339-6900
Fax:    (612) 339-0981

Lee S. Shalov
Thomas G. Ciarlone
**SHALOV STONE BONNER
    & ROCCO LLP**
485 Seventh Avenue, Suite 1000
New York, NY 10018
Phone: (212) 239-4340
Fax:    (212) 239-4310

Andrew N. Friedman
**COHEN MILSTEIN SELLERS
    & TOLL PLLC**
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, D.C. 20005
Phone: (202) 408-4600
Fax:    (202) 408-4699

**Plaintiffs' Counsel**